EARL B. PENNEY et al., by HENRY M. RAMEY, JR., NEXT FRIEND, v. ST. JOSEPH STOCK YARDS COMPANY, Appellant.

Division Two, May 19, 1908.

1. **NEGLIGENCE: Fellow-Servant Act: Terminal Railroad: Organized as Business Company.** The Fellow-Servant Statute making liable "every railroad corporation owning or operating a railroad in this State" for all damages sustained by any servant thereof by reason of the negligence of a fellow-servant, is broad enough to include a defendant organized as a "manufacturing and business company" which was by its charter given power "to operate terminal lines of railroad" and which in fact is engaged in operating a terminal line of railway.

2. **————: Damage: Suit by Children: Living Wife: Evidence: Petition.** The minor children of a deceased father may prosecute their action for his negligent killing, notwithstanding some woman claiming to be his widow has previously brought suit for statutory damages for his wrongful death; and her petition alone in that suit, to which they were not made parties, is not competent evidence to show that she is his widow, but a mere self-serving statement by her made after his death; and certainly it does not bear on the issues of their case, unless defendant assumes to prove that she is his widow.

3. **————: Switchman: In line of Duty: Moving Cars.** Where the evidence tends to show that the switchman was in a dangerous place, leaning against the dock where cars loaded with hogs were being unloaded into the stock yards; that it was his duty

to be there to ascertain when the unloading was completed, and that it was the rule and custom for the engineer not to move the train until some one of the switching crew gave him the signal that the cars were unloaded, and to move, and he did move the train without notice or warning, it cannot be said that the switchman was not in the discharge of his duties or that he unnecessarily placed himself in a place of danger.

4. ———: ———: **Obvious Danger: Contributory Negligence.** Where the whole testimony tends to show that it was the duty of the engineer not to move the cars until he had received a signal from some one of the switchmen that the cars at the dock of the stockyards were unloaded, and that no signal was given until they were unloaded, and that switchmen customarily placed themselves in places of danger that they might ascertain when the cars were unloaded and give the engineer the signals, and they were not called upon to anticipate that the cars would be moved either before such signals were given or before the engineer had given warning or notice, the switchman, who, in the line of his duties, placed himself against the dock where a moving car would strike him, was not, because of the obvious danger, guilty of contributory negligence.

5. ———: **Contributory: Instruction.** The court refused to instruct the jury that "if you find from the evidence that" the deceased switchman "was not required at the time in the performance of his duties to go in between the cut of the cars and place himself in the position in which he was at the time he was injured by the backing of the cars," then their verdict should be for defendant. *Held,* that the point it presents was fully covered by another instruction given, which told the jury that if the switchman negligently placed himself in a position of danger, plaintiffs could not recover, and by another which told them that if he failed to exercise the vigilance and caution which would have been exercised by a careful and prudent switchman under similar circumstances in the discharge of his duties, and the failure to exercise such caution contributed to his death, plaintiffs could not recover. Moreover, the instruction was faulty in leaving out the usual and proper method for the deceased to perform his duty, and in not submitting to the jury whether his act in going between the uncoupled cars as he did, and for the purpose he did, was negligence.

Appeal from Buchanan Circuit Court.—*Hon. Henry M. Ramey,* Judge.

AFFIRMED.

*Thomas F. Ryan* for appellant.

(1)   Penney was negligent in voluntarily taking a position of peril and remaining there.   Such negligence directly contributed to his injury and bars a recovery. He knew the cars would likely be moved and he was not in a position to see when the signal to move was given, nor was he where his danger was known to the other men of the crew.   Defendant's demurrer to the evidence should have been given.   Doerr v. St. Louis Brewing Co., 176 Mo. 547; Smith v. Forrester-Nace Box Co., 193 Mo. 715; Richardson v. Mesker, 171 Mo. 666; Zumault v. Railroad, 175 Mo. 288; Hudson v. Railroad, 123 Mo. 445; Gurley v. Railroad, 104 Mo. 211; McCarty v. Rood Hotel Co., 144 Mo. 397; Sidlinger v. City of Kansas, 126 Mo. 315; McKee v. Railroad, 96 Mo. App. 671; Towner v. Railroad, 52 Mo. App. 648; Loring v. Railroad, 128 Mo. 349; McIntosh v. Railroad, 58 Mo. App. 281; McKenna v. Railroad, 54 Mo. App. 161; Kelly v. Railroad, 11 Mo. App. 281; Caldwell v. Railroad, 181 Mo. 445.   The fact that other men went in the opening between the cars to look, if such was the case, did not relieve the act of being negligent.   If this was a negligent act, and it was, the custom of others going in such a place did not change its character and relieve Penney.   Smith v. Forrester-Nace Box Co., 193 Mo. 715; Doerr v. St. L. Brewing Co., 176 Mo. 547; Warden v. Railroad, 94 Ala. 285; George v. Railroad, 109 Ala. 256; Andrews v. Railroad, 99 Ala. 438; Hickey v. Railroad, 14 Allen (Mass.) 429; Railroad v. Jones, 95 U. S. 439; Railroad v. Robbins, 43 Kan. 145; Bryant v. Railroad, 56 Vt. 710.   If it was Penney's duty to look along the dock and see if it was clear, he should have been careful in the performance of that duty.   There were several ways open to him to obtain a view of the dock.   He could have climbed on top of the cars.   He could have crossed between the cars and stepped up on the dock by putting his foot on

the step of the car.  It was not necessary for him to deliberately stand where he would be crushed by the cars.  Where more than one way is open, and the servant chooses the dangerous way, the master is not liable.  This Penney did, and plaintiffs cannot recover. Smith v. Box Co., 193 Mo. 715; Moore v. Railroad, 146 Mo. 572; Hulett v. Railroad, 67 Mo. 239.  (2)  In order to entitle plaintiffs to recover it was necessary for them to plead and prove that their father, at the time he received the injuries which resulted in his death, was in the line of his duty.  There was an entire failure of proof on this point.  Plaintiffs' testimony all showed that at the time the deceased Penney was injured he was not in the line of his duty.  It was urged at the trial court, and will be urged here, that Penney's duty required him to go through the cut in the cars to ascertain whether the cars had been unloaded and then to give the signal to the engineer to connect up the cars.  This assumption is contradicted by plaintiffs' own testimony.  The witnesses Sparks and Blakely, who were plaintiff's witnesses, both testified that they were at the north end of the cars to ascertain when the cars were unloaded, and then to signal the engineer.  That was their duty.  Penney's duty was to follow the engine, that is, to throw the switches, etc. No witness has testified that at this time any duty called him between the cars.  Penney, therefore, at the time he was injured had placed himself in a position of danger, where his duty did not call him, and, therefore, cannot recover.  Stagg v. Tea Co., 169 Mo. 489; Schaub v. Railroad, 106 Mo. 74; Barry v. Railroad, 98 Mo. 63; Duval v. Packing Co., 119 Mo. App. 150.  (3)  The court erred in refusing to allow defendant to introduce in evidence the petition and record in the case of Sadie Penney v. St. Joseph Stock Yards Company.  The Sadie Penney case was instituted first.  The evidence showed that Sadie Penney was living with the deceased as his wife and was reputed to be his wife at the

time of his death. The law presumes that they were married and that she was his widow. Cargile v. Wood, 63 Mo. 501; State v. Cooper, 103 Mo. 266; Dyer v. Brannock, 66 Mo. 391. The statement of Sadie Penney that she was his wife prima-facie established the presumption. White v. Maxey, 64 Mo. 552; Ashford v. Ins. Co., 80 Mo. App. 638. The court should not have tried this case until the case of Sadie Penney was determined. If she was the wife, she had the right to sue in the first six months; after that the children could sue, if she did not. She did sue and the presumption is that she was the wife. She appropriated the cause of action and the children could not sue. McQuade v. Railroad, 200 Mo. 150; Packard v. Railroad, 181 Mo. 421.

*C. F. Strop, J. W. Mytton, H. M. Ramey, Jr.,* and *Eugene Silverman* for respondents.

(1) The deceased at the time of his death was in the performance of his duties. The act of the engineer in starting the engine before the train was unloaded and without any signal from any switchman so to do, and without a warning by him of his intention so to do, and especially when no reason for such movement of the train is assigned, and there was no necessity therefor, was the cause of the death of plaintiffs' father, and entitled plaintiffs to recover. Black v. Railroad, 172 Mo. 177; Cambron v. Railroad, 165 Mo. 543; Beams v. Railroad, 58 Iowa 150; Wilkens v. Railroad, 101 Mo. 93; Butler v. Railroad, 87 Iowa 206; Railroad v. Baker, 106 Ala. 624; Railroad v. Lanier, 87 Ga. 587; Railroad v. Barnett, 89 Ga. 399; Railroad v. Fulghum, 94 Ga. 571; Lowe v. Railroad, 89 Iowa 420; Strong v. Railroad, 94 Iowa 380; Railroad v. Murray, 55 Kan. 336; Railroad v. Wallingford, 22 S. W. 439; Railroad v. Hanning, 31 N. E. 187. (2) It was shown that Penney was divorced from his wife and there was no presumption that he thereafter married. Johnston v. Johnston, 170

Mo. 55; Karstens v. Karstens, 20 Misc. (N. Y.) 247; Erskine v. Davis, 25 Ill. 251; Wiseman v. Wiseman, 89 Ind. 479.

GANTT, J.—This is an action by the plaintiffs, who are minors, by their next friend, against the Stock Yards Company for the alleged negligent killing of their father, Rufus Penney, on December 4th, 1904, at St. Joseph, Missouri. The Stock Yards Company is a corporation organized under article 8, chapter 42, Revised Statutes 1889, now chapter 12, article 9, Revised Statutes 1899, entitled Manufacturing and Business Companies, in 1896. Among other purposes of this corporation as set out in its letters was "The operation of terminal lines of railway" in connection with its stock yards and packing houses in the city of St. Joseph.

The evidence tended to prove that at the time of the injury complained of, the defendant owned a number of miles of railroad tracks at the city of St. Joseph and large terminals therein and large pens and yards for the receiving and handling of live stock, and maintained a roundhouse, and at the time of the killing of plaintiffs' father continuously operated six locomotive engines and employed the necessary crews to operate the same, and did the necessary switching for the six principal railroads converging at St. Joseph in connection with the said stock yards. Each engine had a switching crew of three men besides the engineer and fireman. The hog pens were about six hundred feet long south-and-north. Along side of the hog pens was a large platform about twelve feet wide and running the full length of the said hog pen. This platform or "dock," as it was called, was about on a level with the floor of a stock car, and was used for unloading cars. Gates that were fastened to the posts of the hog pens, swung round from the dock and were adjusted to the car doors, and in this way a narrow enclosure or passage way was formed, so that the hogs could be driven

from the car across the dock into the hog pens. Along
side of and immediately east of this dock was a railroad
track of the defendant, upon which the cars were set to
be unloaded. The space between the dock and the cars
when standing on this track was about six to ten inches.
The petition alleged the appointment of the next friend
to institute and prosecute this suit for the plaintiff
minors; also the incorporation of the defendant, and
that at the time of his death Rufus F. Penney was un-
married and left no widow surviving him; that the de-
fendant in its railroad business used and operated loco-
motive engines and trains and that each of said engines
and trains maintained a train crew, each of said crews,
being composed of an engineer, a fireman and two
switchmen; that defendant had large docks in and
about its yards, constructed and used for the purpose
of unloading live stock from railroad cars into its said
stock yards, and alongside of said docks are railroad
tracks used for the purpose of transporting cars to,
alongside of and flush with said docks. That on and
prior to the 6th of December, 1904, the father of the
plaintiffs, said Rufus F. Penney, was in the employ of
the defendant in the capacity of a switchman in one
of its said train crews. The petition further states
that at all times there were large numbers of men en-
gaged about the docks of the said company in unload-
ing live stock from the cars on the tracks alongside of
said docks, and it was the duty of the train crew, of
which their father was switchman, to run or cause to be
run cars loaded with live stock upon the tracks along-
side of said docks to be unloaded and to remove from
said tracks cars that had been unloaded by the em-
ployees engaged in unloading the same; that at all
times there were large numbers of cars along the side
of said docks, and in the performance of his duties it
was the duty of their father to ascertain before moving
a car on the tracks by said docks whether or not men
were engaged at work on or about the cars or docks,

who were liable to be injured by the moving of said cars, and if it was desired to couple cars together to ascertain before moving said cars whether or not any persons were in a position of danger, and whether or not in case said cars were moved in coupling the same, any person was liable to be injured; that it was the duty of the engineer to permit the cars and his engine to which the same were attached to remain stationary until he received a signal to move said cars, from the foreman of the switching crew or some member of the said crew in which plaintiffs' father was working, and it was the duty of said foreman not to give said signal until said foreman was notified so to do by plaintiffs' father. The petition then states that on the 6th of December, 1904, while the father of plaintiffs was engaged in performing his duties as switchman as aforesaid for defendant, one of defendant's steam engines was standing attached to a number of cars alongside of one of said docks, and at said time and while said switching crew were about to and were preparing to couple or attach said cars to other cars alongside of said dock, which said cars were about six or seven feet from the cars to which said steam engine was attached, their said father, in the performance of his duties and while in the exercise of due care, walked alongside of said cars to which said steam engine was attached and on the side thereof opposite to the said dock and to the end of the cars to which said steam engine was attached and walked across the railroad tracks between said cars to the said docks where he could obtain a full view of said docks for the purpose of ascertaining and learning, as it was his duty to do, whether or not any person in or about said train or cars or docks was in a position of danger, or where he would likely or probably be injured by the movement of said engine and cars attached thereto, for the purpose of coupling said train to said other cars, and while their said father was so looking in accordance with his duty so to do, the en-

gineer in charge of the engine attached to said cars suddenly and without warning to their said father and without any signal to do so from their father or the foreman of said switching crew, carelessly and negligently moved or caused to be moved the cars and engine rapidily toward, upon, against and over their father; that at the said time their father was close to or leaning against said docks, and while in said position and place, said engine and cars were negligently and carelessly by the engineer and employees of the defendant in charge thereof, moved upon, against and over him without any warning or signal from him or any other person authorized to give said signal, and thereby their said father was caught between one of said cars and said dock, which was only about seven inches from the side of the car, and was so bruised, maimed and crushed that he died immediately from the effects thereof. Plaintiffs state further that the engineer and other employees of defendant in charge of said engine before moving the same, by the exercise of ordinary care on their part, could easily have seen and known the position of peril and danger their father was in and by the exercise of ordinary care could have avoided injuring him, but said engineer and the other employees in charge of said engine, carelessly and negligently moved said engine and cars upon and over him. There was a prayer for judgement for five thousand dollars for damages resulting from the death of their father.

The defendant in its answer admits its incorporation but denies that it was engaged in operating or carrying on a general railroad or terminal business. It charges the fact to be that it was incorporated as a business corporation under the laws of this State and was engaged in the general business of conducting a stock-yards company, and as an incident thereto it owned and maintained certain terminal railroad tracks, which were laid upon its own premises and operates thereon switch engines for switching and moving such

cars as are brought to its yards in the operation of its business. It denied each and every allegation except such as were specifically admitted. It then pleaded an assumption of all ordinary risks by the plaintiffs' father, which were connected with and incident to his employment as switchman, and that his injury resulted from one of the said risks. Defendant also pleaded contributory negligence on the part of plaintiffs' father as a direct proximate cause of his injury in placing himself in a position of danger between said cars, knowing at the time that they were liable to be moved.

For another and separate defense the answer alleged that one Sadie Penney on the — day of — 1905, instituted a suit against defendant in the circuit court of Buchanan county, in which she alleged that she was the widow of Rufus Penney and for which she prayed five thousand dollars for his death on account of the negligence of the defendant in killing him and that said suit had been transferred by a change of venue to the circuit court of Clinton county and is still pending and undisposed of. That the said Sadie Penney was seeking to recover of defendant, as widow, damages for the same injury that plaintiffs are attempting to recover upon as his children, and that defendant in its answer in said suit has put in issue the facts alleged in said petition and that plaintiffs are not entitled to maintain this suit until the aforesaid suit of the said Sadie Penney against defendant has been adjudicated. The answer then proceeds to charge that plaintiffs and the said Sadie have entered into a contract wherein they have agreed that they would mutually assist each other in the prosecution of said suit of said Sadie against this defendant and in the prosecution of this suit, and divide the proceeds, if any, realized by judgment or otherwise, and that plaintiffs by virtue of said contract are now estopped from denying that said Sadie was the widow of said Rufus Penney their father.

Defendant for further answer says that the plain-

tiffs allege in their amended petition that the injury which resulted in the death of their father was caused by the negligence of his fellow-servants and they seek to recover in this case on such allegations of negligence of the fellow-servants of plaintiffs' father under and by virtue of the provisions of section 2873, Revised Statutes 1899; that said section has no application and does not apply to the defendant corporation. That if said section 2873 should be construed to apply to this defendant, then it is in violation of section 53 of article 4 of the Constitution of Missouri in granting an exclusive right, privilege and immunity to this class of business, and is unconstitutional in that it changes the rules of evidence. It is also alleged that said section violates section 30 of article 2 of the Constitution, in that it is a taking of defendant's property without due process of law, and violates section one of article 14 of the Constitution of the United States, in that it denies defendant equal protection of the law.

To this answer there was a reply denying all the new matter.

The cause was tried to a jury and resulted in a verdict for the plaintiffs for five thousand dollars. There is little controversy as to the main facts.

On the 6th of December, 1904, Rufus Penney, the father of the plaintiffs, was employed by the defendant as a switchman and as one of a crew operating one of the engines of the defendant. This crew consisted of said Penney, Sparks and Blakely, Sparks being foreman. The engine was in charge of a Mr. Wright, the engineer, and Lyons, the fireman. There were twenty cars in the train with which this crew were working, at least eight of which were loaded with hogs. Alongside of the track upon which this train was pulled, was an unloading dock and the hogs were unloaded by setting the doors of the cars in such a manner that the car doors opened immediately opposite chutes in the hog pens, and in order that the doors might be just opposite

the chutes as aforesaid, it was frequently necessary to cut the trains, and on this occasion at this particular place the train was cut into two parts, leaving twelve cars in one string attached to the engine and the eight cars loaded with hogs in the other string. Between these two sections of this train thus cut in two there was a space of about six feet. The engine was at the south end of the train, and the unloading was being done from the west side of the eight cars north of the opening between the two sections. The dock hands unloaded the cars and the switching crew had charge of the moving of the cars and they had nothing to do with the unloading. The evidence tends to show that after this train had thus been cut in two, it was the duty of the engineer not to move or start the train in motion until and unless he received a signal so to do from either the foreman Sparks or Blakely or Penney. And that it was the duty of the engineer to obey the signals of the foreman, but that it was his duty also to obey the signals of either of the said switchmen in the absence of the foreman. The docks upon which the hogs were unloaded were about four feet high and stood from six to ten inches from the cars, leaving barely room enough to permit the cars to pass when in motion. This space between the cars and the docks was so left because the cars were of uneven width and for the further reason that when in motion the cars would rock from one side to the other, and it was necessary to leave some space so that the cars would not come in contact with the docks. The evidence also showed there were ten or twelve men, upon the dock and in the cars, engaged in unloading this train-load of hogs, and that the movement of this train before it was unloaded or before these employees had an opportunity to get out of the way, would be attended with great danger to them. It was the duty of the switching crew and each of them, while the hogs were being unloaded, to take positions

about the dock and the train, so that they might inform themselves where the men were at work in unloading the hogs and when the unloading has been completed, and it was their duty not to permit the train to move until it had been entirely unloaded, and the switching crew took various positions so as to enable them to inform themselves as to the situation. Testimony discloses that after this train had been cut in two, Penney, the deceased, went into the cut between the cars and stood leaning over the dock so that he would be in a position to see what the men engaged in unloading were doing, and so as to tell when the train was unloaded. The evidence also tended to show that cuts similar to the one made in this train were frequently made in trains while they were being unloaded, and it was customary and usual for the switchmen to go between the train of cars and into the open space as the deceased did at the time he was injured. On the part of the plaintiffs the evidence tended to prove that while Penney, the deceased, was in the position aforesaid leaning against the dock, without any warning to him or to any one and without any signal from him or from either of the other switchmen, and before the train was unloaded, the engineer in charge of the engine in question suddenly caused the engine to be put in motion and the two sections to be thrown together, thereby catching the deceased between the cars, crushing and bruising him to such an extent that he died almost immediately. Sparks and Blakely both testified positively that neither of them gave any signal to the engineer and they heard no signal from the engineer of his intention to start. A number of the dock hands engaged in unloading the cars also testified that the engineer gave no signal before starting the engine. On the other hand, the engineer and his fireman testified that the engineer caused two blasts of the whistle to be

blown before he put his section in motion. The engineer testified that Penney, the deceased, gave him a signal to move. No other person saw Penney give the signal, and the other witnesses testified that at the time he was hurt he was leaning across the dock with his pipe in his mouth and entirely ignorant of any intention on the part of the engineer to move the train. Evidence tended to show that at the time Penney was killed he was in a position where it was not possible to give a signal to the engineer, because he could not be seen by the engineer. Other facts will be noted in the course of the opinion. Various errors are assigned for the reversal of the judgment and they will be noted.

I. The plaintiffs invoke the benefit of the Fellow-servant Act of 1897, now incorporated in Revised Statutes 1899, as section 2873, which provides: ''That every railroad corporation owning or operating a railroad in this State shall be liable for all damage sustained by any agent or servant thereof while engaged in the work of operating such railroad by reason of the negligence of any other agent or servant thereof: *Provided,* that it may be shown in defense that the person injured was guilty of negligence contributing as a proximate cause to produce the injury.'' That the engineer and the father of the plaintiffs, the switchman, were fellow-servants is not questioned. But the defendant insists that as it was incorporated under article 8, chapter 42, Revised Statutes 1889, which provides for the incorporation of private corporations under the head of ''manufacturing and business companies,'' it was not a railroad corporation and does not fall within the purview of the Fellow-servant Act of 1897. In Powell v. Sherwood, 162 Mo. 614, this court In Banc held that section 2873, Revised Statutes 1899, must be construed and read in connection with section 1163, Revised Statutes 1899, which provides that: ''The term 'Railroad corporation' contained in this chapter shall

be deemed and taken to mean all corporations, companies or individuals now owning or operating, or which may hereafter own or operate, any railroad in this State.'' The charter of the defendant in express terms authorizes it ''to operate terminal lines of railway'' in connection with its stock yards. And the evidence demonstrated that the defendant owned a number of tracks in and about its yards and maintained at least six engines, which were operated by engineers and firemen and regular train crews of switchmen, and was constantly engaged in receiving trains loaded with stock from the various roads centering at St. Joseph, and that it did the necessary switching in handling these trains and unloading the same and returning the cars to the various companies. In a word, it performed all the operations of a regular terminal railroad. In view of the express provisions of section 1163 and the decision of this court in Powell v. Sherwood, 162 Mo. 605, we are of the opinion that the statute is broad enough to include the defendant and covers all railroads, whether owned by a railroad corporation technically incorporated as such, or by any other corporation, company or individual owning and operating a railroad in this State, and therefore the contention of the defendant on this point can not be sustained.

II. Error is assigned on the refusal of the circuit court to permit the defendant to introduce in evidence the petition and the order awarding a change of venue from Buchanan county to Clinton county in the case entitled ''Sadie Penney v. The Stock Yards Company.'' To properly understand this point reference must be had to the pleadings in the case and what occurred at the time this offer of this evidence was made in the circuit court. In the answer by defendant, it is nowhere alleged that the said Sadie Penney was in fact the widow of Rufus Penney and therefore entitled alone to maintain this action. When the offer was made, coun-

sel for the defendant said: ''I presume we may con-
sider in evidence the petition in the case of Sadie Pen-
ney against defendant;'' whereupon, counsel for the
plaintiffs replied, ''I am willing to consider the entire
record in that case.'' It will be noted that if the entire
record in the case of Sadie Penney against the defend-
ant had been put in, it would have included the answer
of the defendant, in which, as alleged by the defendant
in this case, he had put in issue the fact that said Sadie
Penney was the widow of Rufus Penney, deceased.
Counsel for the defendant, however, insisted upon his
right to offer simply the petition of Sadie Penney and
so much of the record as showed that the case had been
transferred on change of venue to Clinton county, to
which the plaintiffs objected as wholly immaterial.
The court having intimated that the offer was not com-
petent, counsel for the plaintiffs thereupon stated: ''I
want the record right. If Mr. Ryan [counsel for de-
fendant] proposes to follow this proof and show that
this woman is Penney's wife, it is possible that the tes-
timony might be competent, but unless he does so it is
not competent.'' The Court: ''It will be excluded
unless Mr. Ryan proposes to prove that this woman is
his wife.'' Thus, it will be seen that the attorneys for
the plaintiffs withdrew all objections to this kind of tes-
timony if the claim was made that Sadie Penney was
the widow of Rufus Penney, and the circuit court offer-
ed to permit the fullest investigation of that question.
We think under the facts thus shown, the trial court
correctly excluded the evidence. Certainly it is not the
law that the minor children of a deceased father can not
prosecute their action for his negligent killing because
some woman may bring her suit · claiming to be the
widow of the deceased. The minor plaintiffs in this
case were no parties to the suit of Sadie Penney against
the defendant, and would not be bound by any judgment
therein, nor would they be estopped by her allegation

in her petition, in a separate suit, that she was such widow. That the defendant might in a proper proceeding, if it had so desired, have required the issue as to whether said Sadie Penney was the widow of said Rufus Penney determined, so that it would not be liable for the penalty to both the widow and the children, may be true, but no such step was taken in this case, and when the defendant refused to even allege that the said Sadie Penney was the widow of Rufus Penney, and declined the court's offer to permit it to so show, we think the circuit court properly refused to permit her petition in evidence as it was a mere self-serving statement of hers made after the death of Rufus Penney, which was in no sense binding upon the plaintiffs in this case. It is true the defendant contends that there was evidence tending to show that said Sadie Penney was living with the deceased as his wife at the time of his death, and that from this there was a presumption that she was his wife. But whatever presumption might arise from that fact was clearly rebuttable. The only evidence on this point was that of the witness Blakely, who testified that he had seen Sadie Penney once, and when asked if she was living with Rufus Penney as his wife, answered, "Yes, sir." But he did not know that this was the same Sadie Penney who brought the suit to recover for the death of Rufus Penney. On cross-examination he stated that all he knew about her was what he had heard, and that he had also heard that she was not his widow but that she was his mistress. The plaintiffs' testimony showed that Rufus Penney had theretofore been married to the mother of the plaintiffs, but that she had been divorced from him.

The most that can be said of Blakely's testimony is that it tended to show a general reputation that the deceased Rufus Penney had been married to the said Sadie Penney and the learned counsel for the defendant cites Cargile v. Wood, 63 Mo. 501, in which it is held

that from cohabitation and reputation the marriage relation may be proven, but in the same case it is said that if there is a conflict in the report, that is, of the reputation that the parties were married, it will not establish the marriage. But this question of whether Rufus Penney left a widow surviving him at the time of his death, was a question of fact which was submitted to the jury and they found that he had no widow surviving him. The defendant did not request an instruction submitting this question to the jury and therefore by its conduct abandoned that contention.

III. The defendant insists that its demurrer to the evidence should have been sustained on the ground that Rufus Penney's own negligence was the direct and proximate cause of his death, in that he placed himself voluntarily in a position of peril and remained there when he knew the cars were likely to be moved and when he was not in a position to see when the signal to move was given, nor was he where his danger was known to the other men of the crew. This contention is based upon two propositions, first, that the deceased at the time of his death was not in the discharge of his duties, but had unnecessarily placed himself in a place of great danger, and, second, that at the time of his death, deceased had placed himself in a position of such obvious danger that he was guilty of contributory negligence. As to the first proposition, it would seem that there is little ground for the contention as to what were Penney's duties. His fellow switchmen, Sparks and Blakely, both testify. Sparks said there were no printed rules governing the action of the switching crew in these matters. He was then asked by the court, "Whose duty was it to ascertain whether or not the car had been unloaded?" and he answered, that it was his duty and he was assisted in the discharge of that duty by Penney and Blakely. He also testified that he did not give any signal to the engineer to start, and neither

did Sparks, nor did he direct Penney to do so. He tes-
tified that Penney was a very careful man; that the cars
were not all unloaded at the time of the accident; that it
was the duty of the persons connected with the train
crew to watch out and be on the lookout to see that
there was no danger to any of the persons who were
around working in connection with the cars and hogs.
That it was the duty of the engineer not to move the
cars back until they were unloaded and he had received
a signal to do so. Mr. Blakely, the other switchman,
testified that Penney was an efficient helper. From the
place where he was standing at the time Penney was
hurt, he, Blakely, could not see the engineer; that he
was not expecting the train to be moved because the
hogs were not all unloaded. Asked what Penney would
do to ascertain whether or not the cars were unloaded,
he answered, "Very frequently he would step in where
the cut had been made and the cars cut apart and look
up and down the dock to see that the dock was clear."
That it was the practice and custom of the switchmen
to step inside to the dock and look up and down to see
if the cars were all unloaded, and if they were they
would give the signal to couple up and move, and it
was the duty of the engineer to let the cars stand still
until he received such a signal; that it was always
the duty of the switchmen to look before the cars were
moved. That it was a part of Penney's duty to see if
the dock was clear. When counsel for the defendant at-
tempted to show by this witness that it was no part of
Penney's duty, but that the duty devolved upon Sparks,
the foreman, and the witness, Blakely, the witness an-
swered, "We were all there for the same purpose;"
and when asked if Penney did not know when he
stepped in between the cars that witness was likely at
any time to give the signal, he answered, "Not before
the hogs were out." He also testified that he did not
give the engineer any signal to move, and no one else

did. Accordingly, we think the record tends to show that Penney at the time of his death was in the line of his duty, and hence the doctrine invoked that if a servant departs from his duty and goes outside of the scope of his employment and assumes a position of hazard and danger, he can not recover, does not apply to the facts developed in this case. But it is said on behalf of the defendant that the fact that there is a custom to do a thing in a certain way is no defense to a plea of contributory negligence when the manner of doing a thing is *per se* negligent. As to this proposition no authority is necessary; it is self-evident. But this whole contention is based upon the assumption that the deceased knew that the engine would be started without a signal from either himself or his fellow switchmen and without warning from the engineer, whereas the whole testimony tends to show that it was the duty of the engineer not to move the cars until he had received a signal either from Penney or one of the other switchmen, and that he was not called upon to anticipate that the engine would be moved until all the hogs were unloaded, and not then until the engineer had given a proper warning, and it was agreed on all sides that the hogs were not unloaded, and the great weight of the testimony was to the effect that the engineer did not give a warning of his intention to move, although he and his fireman testified that he did. Accordingly, we are unable to accept the contention of the defendant that the deceased in going between the cars and in the open space, was guilty of such contributory negligence as would bar a recovery by his children. In Black v. Railroad, 172 Mo. l. c. 190, it was said by BURGESS, J.: "It is clear that the accident was the result of negligence on the part of the engineer to whose engine the cars were attached that occasioned it. He had stopped the train in obedience to a signal from the plaintiff as switchman. He was also signaled by plaintiff in accordance with the

custom of the yardmen to stand still, but in disobedience or non-observance of these signals, and without any signal of any kind whatever, he put his engine in motion, backed up, caught plaintiff in between the damaged car and the one to which it was attached, thereby crushing his body, and seriously injuring him.'' That case, as to the question now under consideration, is identical in principle with the case before us, save only that the plaintiff in that case was in a more dangerous position than the deceased in this case.

But in this connection the defendant complains of the refusal of its ninth instruction. That instruction is as follows:

''The court instructs the jury that if you find from the evidence that the deceased, Penney, went into the cut between the cars and took a position in which he placed himself, leaning against the dock and smoking his pipe while in that position, and if you further find from the evidence that the engineer was required to move said car at any moment on a signal given to him by the foreman Sparks or by the helper, Blakely, and if you further find from the evidence that the deceased, Penney, knew this fact, then the deceased, Penney, was guilty of contributory negligence and plaintiffs can not recover in this case.''

That instruction leaves out the controlling point in the case, in that it fails to instruct the jury that if the engineer was required to move the train upon a signal from Sparks or Blakely, and if the jury find that the engineer did move it upon such a signal, there can be no recovery. The fact that the engineer was required to move the train upon such a signal would avail nothing if such a signal in fact was never given to him, as evidence for the plaintiffs clearly tends to show. Both Sparks and Blakely testify that they gave the engineer no signal, nor does the engineer assert that he received a signal from either of them. Notwithstanding Penney

might have known that, if such a signal was given the engineer, he would obey it, the evidence tends to show that he knew or at least had the right to believe that no such signal would be given until the train was unloaded and a signal had been given to the engineer to start.

In this connection it is argued by counsel for the defendant that the giving of its third instruction did not cure the refusal to give its ninth instruction. The third instruction was as follows:

"The court instructs the jury that if you find from the evidence that plaintiffs' father negligently placed himself in a place of danger by going in between the cut of the cars and that the placing himself in such a position of danger directly contributed to the injury of plaintiffs' father, then plaintiffs are not entitled to recover in this case, and your verdict will be for the defendant."

This third instruction was as favorable to defendant as it could ask. As defendant asked and obtained this instruction, it is in no attitude to complain of it. And the twelfth instruction also given for the defendant and the plaintiffs' first instruction covered the question of the deceased's contributory negligence.

IV. Defendant also complains of the refusal of its fourth instruction. That instruction is as follows:

"The court instructs the jury that if you find from the evidence that plaintiffs' father was not required at the time in the performance of his duties to go in between the cut of the cars and place himself in the position in which he was at the time he was injured, then your verdict will be for the defendant."

We think this instruction was fully covered by instructions number three and twelve given for the defendant, which told the jury that if the plaintiffs' father negligently placed himself in a position of danger, then plaintiffs could not recover, and if the deceased failed to exercise the vigilance and caution which would have

been exercised by careful and prudent switchmen under similar circumstances in the discharge of his duty, and the failure to exercise such caution contributed to his death, then plaintiffs could not recover. Moreover, instruction number four leaves out of consideration the usual and proper method for the deceased to perform his duty and does not submit to the jury whether his act in going between the cars as he did and for the purpose that he did, was negligence. We think no reversible error was committed in refusing this instruction.

After a full consideration of each and every ground urged for a reversal, we are of the opinion there is no reversible error in the record, and the judgment is accordingly affirmed.

*Fox, P. J.,* and *Burgess, J.,* concur.