## MOUND CITY TRANSFER RAILWAY COMPANY, Respondent, v. WABASH RAILROAD COMPANY, Appellant.

**St. Louis Court of Appeals.  Argued and Submitted December 7, 1910.  Opinion Filed December 30, 1910.**

1. **RAILROADS: Industrial Line.**  Under section 3214, Revised Statutes 1909, a corporation which transports freight on a track by means of electric motor power is a "railroad," although it is not a common carrier to the extent of carrying freight for the general public.

2. ———: **Crossing Accident: Duty to Look and Listen: Applies. to Railroads and Street Railroads.**  The same degree of care should be exercised by an ordinary railroad and a street railroad, while operating trains or cars across the tracks of another railroad, as is required of pedestrians under like circumstances.

3. ———: ———: **Duty to Stop Car on Grade Crossing: Statute Applies to Street Railroads Only.**  Section 3303, Revised Statutes 1909, which requires street cars to be brought to a full stop a certain distance from the tracks of a railroad company, does not apply to an industrial line engaged in the business of carrying freight.

4. ———: ———: **Duty to Look and Listen: Common Law Obligation.**  The duty to look and listen before going upon a railroad track exists irrespective of statute or ordinance.

5. ———: ———: ———: **Plaintiff Held Guilty of Contributory Negligence.**  In an action by an industrial railroad company against a steam railroad company for injuries to plaintiff's electric motor car, resulting from a collision at a crossing of the tracks of the two companies, evidence *held* to show that plaintiff's employees were guilty of contributory negligence as a matter of law in venturing on the track of defendant, without first stopping the motor and using all reasonable precaution by looking and listening to see that it was safe to cross, and that such negligence was the proximate cause of the collision.

Appeal from St. Louis City Circuit Court.—*Hon. Eugene McQuillin,* Judge.

REVERSED.

*James L. Minnis* and *Jones, Jones, Hocker & Davis* for appellant.

(1) The court erred in refusing defendant's instruction in the nature of a demurrer to the evidence offered at the close of plaintiff's case. Plaintiff's evidence clearly showed that its servants were guilty of negligence as a matter of law. Drake v. Railroad, 51 Mo. App. 568; Dey v. Railroad, 140 Mo. App. 461; Kelsay v. Railroad, 129 Mo. 372; Hook v. Railroad, 162 Mo. 569. (2) The court erred in refusing defendant's instruction in the nature of a demurrer to the evidence offered at the close of all of the evidence. R. S. 1909, sec. 3303; Mulderig v. Railroad, 116 Mo. App. 655.

*S. T. G. Smith* and *Thos. S. Meng* for respondent.

(1) Defendant's failure to ring the bell and to have a man stationed on the end car, as required by ordinance, was negligence *per se*. Gass v. Railroad, 57 Mo. App. 574; Hutchinson v. Railroad, 161 Mo. 246. (2) Defendant's conduct in running its cars at a high and unusual rate of speed was negligence under the circumstances and conditions shown by the evidence. Meng v. Railroad, 108 Mo. App. 553; Story v. St. Louis Transit Co., 108 Mo. App. 424; Holden v. Railroad, 177 Mo. 456; Haley v. Railroad, 197 Mo. 15. (3) Plaintiff's employees had a right to rely on defendant's compliance with the regulations prescribed by the ordinance, and upon the exercise of ordinary care by defendant's servants. Donohue v. Railroad, 91 Mo. 357; Kenney v. Railroad, 105 Mo. 270; Petty v. Railroad, 88 Mo. 306; O'Donnell v. City of Hannibal, 144 Mo. App. 155; Hutchinson v. Railroad, 161 Mo. 246. Under the circumstances shown it cannot be said as a matter of law that plaintiff's employees were

guilty of contributory negligence. Gratiot v. Railroad, 116 Mo. 450; same case, 16 L. R. A. 189, 16 S. W. 384; Hutchinson v. Railroad, supra; Murray v. St. L. Transit Co., 108 Mo. App. 501; Dixon v. Railroad, 109 Mo. 413; Hook v. Railroad, 162 Mo. 569; Smith v. Railroad, 129 S. W. 719. Plaintiff was not operating a street railway and was not subject to the provisions of sec. 3303, R. S. 1909. The giving of instructions based on this statute imposed an unnecessary burden on plaintiff. A verdict in plaintiff's favor having resulted, the matter is immaterial. Hannah v. Railroad, 81 Mo. App. 78; Sams v. Railroad, 174 Mo. 53; Riggs v. Railroad, 120 Mo. App. 335.

REYNOLDS, P. J.—Plaintiff and defendant in this case are railroad corporations, organized and operated under the laws of this state, defendant being an ordinary railroad company, plaintiff operating what is termed "an industrial line," using electric motive power and furnishing switching and terminal facilities to an ice and storage plant at Ninth and Branch streets, in the city of St. Louis, running from that plant to a connection with the tracks of the Wabash Railroad in freight yards east of Broadway. Its motor car was about thirty feet in length and five feet wide, a flat or platform car, without any superstructure above the floor except a power house, as it is called, which was about midway of the car, and was occupied by the motorman, and in which the controller, brakes and other apparatus for operating and controlling the car were located. This power house on the car was an inclosed superstructure but had windows opening on its four sides. The track of plaintiff's railway was laid along Branch street, running eastwardly to a point about midway between Broadway and Second street. Leaving Branch street to the north this track of plaintiff de-

flects in a southeasterly direction toward the switch yards of the Wabash and crosses two switch tracks of the latter and continues to a switch connection with a third Wabash switch track. The action is for damages to plaintiff's motor car or "dummy," as it is called, by reason of being run into by a freight train of the defendant which was being backed from the north along the western switch or side track of the defendant's road, the collision occurring at the first point of intersection of plaintiff's track with this west track of defendant. This west track is the first track reached by plaintiff's intersecting track, as its cars leave Branch street and swing south or southeastwardly. The point of intersection is about fifty feet south of the south line of Branch street. The negligence charged against defendant was in running and backing its train of cars at a high, excessive and dangerous rate of speed and in failing to give any signal or warning of the approach of the train; and a violation of the provisions of section 1753 of the municipal code of St. Louis. The section in question requires any car or cars or locomotives, propelled by steam power, when moving within the limits of the city of St. Louis, to keep the bell of the engine constantly sounding and if any freight car, cars or locomotives propelled by steam power be backing within the limits of the city, a man shall be stationed on top of the car at the end of the train farthest from the engine, to give danger signals; and it provides that no freight train shall at any time be moved within the city limits unless it is well manned with experienced brakemen at their posts, who shall be so stationed as to see the danger signals and hear the signals from the engine. These are the clauses of the section said to have been violated by the defendant. The damages are laid at $3001.38.

The answer, after a general denial, avers contributory negligence on the part of plaintiff, in that it

failed to use ordinary care when approaching defendant's track at the point where the collision occurred, in that it failed to stop, look and listen for the approaching train thereon, but negligently and carelessly ran plaintiff's motor car on the track of defendant and that as a result of this negligence and failure to use ordinary care, plaintiff's car was run into by defendant's train. In reply a general denial was filed.

The trial was before the court and jury.

There were only four witnesses introduced by plaintiff, namely, the motorman and one Haines, his helper, both of whom saw the accident and testified concerning it, and two other witnesses, neither of whom saw the accident but each of whom testified solely as to the amount of damages done to plaintiff's car. Plats of the locality were used by both parties and both were introduced in evidence and are before us. There is no substantial variance between them, save that the one used and introduced by defendant is drawn to a named scale and distances of points referred to are generally marked in feet. We have used that when in doubt as to distances. Following is a rough sketch which may serve to show the location:

AA - PLAINTIFF'S TRACK.
BB - WABASH SWITCH TRACK (WEST)
CC - " " "
DD - " " "
E - SWITCH POST
F - POINT OF COLLISION

The motorman testified concerning the happening of the accident as follows, in his direct examination: He was running plaintiff's motor at the time, and the helper, Haines, was with him. There were no cars attached to the motor, also called "dummy." They were running east. They came down Branch street, going east, until, to quote the motorman, "we hit this curve (pointing to the curve on the plat which was before him) and after we got to this curve Mr. Haines got off the dummy and walked ahead down to this first track," (that is the westerly switch track of the Wabash) "and looked north and south to see if there was any

154 App.—11

trains approaching, but he could see none, and he gave
me a signal to come ahead, and I come ahead, and he
walked across the track, and when he got across the
track, about twenty-five feet, I think, he could see a
little further around this corner, and seen a train ap-
proaching; . . . when he got to the west side of this
track,'' (not shown which track, but witness pointed to
it on the plat) ''he signalled to me to come ahead and
saw no train approaching, and he walked to the east
side of the track and signalled for me to stop immedi-
ately and hollered at the same time there was a train
approaching.'' Whereupon the motorman put on the
brake and also the reverse, ''but (says this witness)
this train was coming so fast I didn't have time to get
over and I tried to stop her''—(objected to as a con-
clusion). He continued that he had not seen any train
approaching and the first he saw of it was when it hit
the dummy—just a second or so before it hit. He fur-
ther testified that the train consisted of a string of
freight cars, box cars and stock cars, a stock car in
front of the backing train, and that hit the dummy;
there was nobody on the rear end of the train. As
soon as he reversed the motor he jumped off and
walked around the coal office (a small building about
ten or fifteen feet west of the west track of defend-
ant's road), and went around to the opposite side of his
motor. The witness indicated on the plat where he
jumped off. Immediately after the motorman had
jumped from his car, the Wabash car hit the dummy.
At the time it was hit, the front trucks of the dummy
were right flush of the west track of the Wabash, flush
of the east rail of the west track (that is directly across
this west track). This witness pointed out on the
plat where he said Haines jumped off the dummy, but
that point is not marked on either plat. He further
testified that when Haines jumped off and as the motor
was approaching the Wabash tracks, he (the motor-

man) looked straight down to see if there was anything coming and if the crossing was clear; could see straight down Branch street; saw no watchman. The gates at Branch street were up. His attention called to a corner shown on the plat, he was asked if he could see around the corner; he said he could not. As far as we can understand the plats, the motorman, at the time and place he referred to, looked north up the track of the Wabash, although he calls it "down" the track. The corner may have been the coal office, the northeast corner of which, as before stated, was about fourteen or fifteen feet west of the west track of the Wabash. This coal office appears to have been on a line with the south line of the sidewalk of Branch street and was a building twelve by fourteen feet. On the north side of the north sidewalk of Branch street, there appears to have been a high fence running out to within twelve feet of the west track of the Wabash and then running northwardly parallel with this west track for about fifty feet. It is possibly what is referred to by witness as a "shed," and the "corner" may have been this fence or possibly the curve in the track of the Wabash around this fence, and around which curve the Wabash train had to come to reach the straight stretch of about 103 feet to the crossing. So that when this motorman is testifying that he could not look straight down Branch street, it was because his view to the north and along the track of the railway of the Wabash, down which the train was approaching, was obstructed by the coal office or by this high fence, or because of the curve in the Wabash tracks which they made in coming around this fence or shed and on down to and across Branch street. Resuming the testimony of the motorman, he said that coming down his own track (evidently meaning before his track swung off on Branch street, along which it ran), he looked down Branch·street, to see if the road was clear as far as he could see and he

did not hear any train approaching or any bells ringing or anything like that, although he listened. He again identified on one of these plats the place where Haines jumped off of the dummy and ran ahead and the place where he first signalled him to come ahead. When he first signalled him to come ahead, Haines was within a couple of feet of the Wabash track, looking up and down, north and south. Branch street, he testified, is much used every day by teams. According to the plat, Branch street crosses the Wabash tracks about fifty feet north of the place where the plaintiff's track crosses the west track of the Wabash. The curve is about forty-five degrees. When the car of the Wabash train hit the dummy, it knocked it "clean off the track," and "mashed it up."

On cross-examination, this witness, after identifying one of the plats and his attention being called to the coal office and to a telephone pole, which was a few feet to the east of the southwest corner of the coal office and twelve feet northwest of the center of the Wabash western track and twenty-nine feet northerly from the place of the accident, said that when the motor car which he was operating came to the south line of Branch street where it turns off, Haines got off the motor car and ran ahead. As appears by one of the plats submitted and as before noted, this point, where the south line of Branch street was left and about where the witness says Haines got off the motor car and ran ahead, was about fifty feet from the place at which the collision occurred. When Haines signaled him to come across the track, the dummy was moving; it was moving when Haines jumped off and did not stop, the motorman testifying that when Haines jumped off he, the motorman, followed with the dummy "right down;" that the motor car was moving about two miles an hour, which was as fast as it could go. The motor car was empty, having no load itself

and drawing no other cars. It was equipped with a hand brake and a power brake and an apparatus for reversing. When Haines waved to him to come ahead, Haines was within a couple of feet of the west track and the dummy was close up behind him, about five or six feet, says the motorman; was not seventy or seventy-five feet away when Haines waved to him to come on. The dummy was about eight feet from the west track when Haines waved to the motorman to come across. Asked if he had gone ten or twelve feet after that before he was struck, the motorman testified that he had gone twelve or fourteen feet and that his dummy was struck just as quick as he got on the track; that Haines walked across the track about twenty or twenty-five feet and then motioned him to stop and hallooed; that Haines walked twenty-five feet after he got off the dummy while the dummy moved eight feet and then Haines motioned him to stop. He was asked whether as a mater of fact his car kept moving the entire time and he answered, "just moving slowly;" put the brakes on and reversed but the wheels were sliding and the car would not "come back;" did not see the Wabash train until just a second before it struck him. His dummy was about thirty feet long; he was looking right ahead when he was crossing. After Haines crossed the track, he stopped and hallooed to the motorman, signaled to him before he hallooed. Haines was looking north and south up and down the Wabash tracks. When Haines reached the track he walked southeast; followed the tracks. One of his purposes in going ahead was to throw the switch. This switch was to the third Wabash track, that is the second track to the east of the track on which the collision occurred, and the switch was about one hundred feet away. Haines was walking toward it, in a southeasterly direction. The motorman further testified that he did not look toward the north when approaching the

track, was looking toward the east the whole time. This motor car or dummy was about the same as a regular street car, so far as the operating devices were con-cerned, equipped with a controller, gong, airbrake and handbrake.

Haines, the helper, testified in chief that he was on the dummy the day of the accident and just before it. He testified in his direct examination that the accident happened on the 23d of November, 1906, between three and four o'clock in the afternoon, "a nice day." After describing the motor and testifying that he was on it when it left the plant of the Mound City Ice & Storage Company, with the motorman, he testified that leaving the plant they went east along their tracks, going after a car; had no car attached to the motor at the time; that as they were leaving Branch street, he ran ahead to see if there were any cars approaching or any switching being done and to keep out of their way, and was probably fifty or seventy-five feet ahead of the dummy; could see no one or any trains approaching at that time, looking north. To quote him he said: "There is a small coal shed, that is between the tracks, set in a sort of a V-shaped place, and across Branch street is a large shed, and as we approached the crossing there was nothing up in sight and the dummy approached carefully, probably two or three miles an hour, something like that, up to the time he got on this track, and there was an engine approaching from the north, backing in, without any signals or bells ringing, evidently no one on the top of the cars, and no watchman with it, coming, I should judge, at the rate of ten or twelve miles an hour, came so rapidly that there was no chance for us to stop, and I signaled and hollered to the motorman—" On motion this testimony as to the Wabash train coming so quickly, etc., was stricken out. Witness resumed: "And the train hit us in the center and knocked us some

four or five feet to the south, bent the body of the car, broke the axles, broke the wiring, and damaged the car so it was useless." Witness further testified that when he jumped off the car, he should judge he had walked about fifty or seventy-five feet ahead; was looking for a car and saw none at all. When he first saw the approaching car of the Wabash it was within ten or fifteen feet of the switch. Then, he testified, he "hollered to the motorman and gave him the signal to stop and reverse," which he did. He (witness) saw the train approaching from the north, a train made up of box freight cars, pushed by the locomotive which was back of them, pushing them. A box car hit the dummy. There were five or six cars in this Wabash train. Witness saw the box car as it approached. There was nobody on it; saw no employees connected with the operation of the train at the time. The motorman jumped to the north side of the dummy and saved himself.

On cross-examination, this witness testified that he was "right on the motor car" as it came down and approached the street from the west, "right on the forward end;" the motorman was back in the middle of the dummy, in the power house on it, which was about the middle of the dummy. As the track of the plaintiff comes down Branch street, he further testified, it takes a little detour to the south, comes by the coal office and crosses the Wabash tracks about at right angles; knew the Wabash tracks were there and the motorman knew it. Continuing the witness said he got off the motor car when it was some seventy-five feet from the crossing and ran down to the Wabash tracks and looked north; could see probably 110 or 125 feet to the north; saw nothing; after he looked he walked out on the Wabash tracks to the switch to turn it; the switch is beyond the crossing and the crossing was on his way. As he walked over to turn the switch he looked over again toward the north. The second time he looked he

saw the train approaching. The dummy was then
about fifteen feet away, and was running at a rate of
two or three miles an hour, no faster. Witness hal-
looed to the motorman to reverse and jump, which the
motorman immediately did, reversing before he jumped
and applying the brakes. This witness being asked
what he was looking at between the time he first looked
when he said the dummy was seventy-five feet away
and the time he looked the second time when he saw
the Wabash train coming toward the switch, answered
that he was looking ahead of him, not looking to-
ward the north, but toward the switch. When he first
saw the Wabash train, it was ten or possibly twenty-
five feet north of Branch street, north of the north
line of Branch street, behind the shed. The shed re-
ferred to appears to be the high fence along the north
side of Branch street and then, after reaching the
Wabash right of way, runs northwardly parallel with
the railroad track of the Wabash, and before referred
to. Asked if he could see beyond this shed toward the
north, he answered that he could after he was on the
Wabash tracks unless there was a train in the way;
that when on the Wabash tracks he could see several
hundred feet up the tracks provided there had been no
train in the way. Asked how far away the front end
of the dummy was when he first saw the Wabash train
backing in, he answered some fifteen or twenty feet.
Knew the kind of brakes on the dummy; it had a hand
brake and power brake and that the current could also
be reversed. Had seen the dummy stopped. If it was
running two or three miles an hour it could be stop-
ped, possibly in twenty-five feet, maybe in thirty,
"about in its own length," said the witness, its length
being thirty feet; doesn't think it could be stopped in
less than that, running at two or three miles an hour.
The dummy was struck in the middle. After the Wa-
bash train ran into the dummy, it stopped, could not

run at all; stopped right there. From the time he first saw the Wabash train until it struck the car, thought the Wabash train had diminished its speed. Didn't see anybody on the east side of the Wabash train; saw no one when he came down to go across the tracks; if any one had been there would probably have seen them. The coal shed spoken of, this witness testified, was between fifteen and twenty feet west of the Wabash west track. All that was between the coal shed and the Wabash track was a telephone pole. When witness was within fifteen feet of the Wabash track he could see up the track. When he got down on the track itself he could see several hundred feet up the Wabash track, if there had been no train on the track to obstruct the view. Evidently the testimony of the witness that the Wabash train was running eight or ten miles an hour is a mistake. It could not have been going at that rate and come to a full stop at the instant of the collision.

This is practically all the evidence on the part of plaintiff as to the happening of the accident; as before remarked, its two other witnesses testifying to the extent of the damage done.

At the close of plaintiff's case and again at the close of defendant's case, defendant interposed demurrers. It is not claimed that plaintiff's case was in any manner helped out by the testimony given by the defendant, and we can say from our own reading of all of that testimony, that the plaintiff's case was not in any manner helped out by that of the defendant. There was no rebutting evidence.

On the facts disclosed by plaintiff's own evidence, giving it every possible probative force, we are compelled to say, as a matter of law, that there is developed here a case in which it so clearly and conclusively appears that the negligence on the part of plaintiff so directly contributed to the accident as to

debar it from a recovery. We think that the principles of law applicable to the case are covered by the decisions of our Supreme Court in Kelsay v. Missouri Pac. Ry. Co., 129 Mo. 362, 30 S. W. 339; and Hook v. Pac. Ry. Co., 162 Mo. 569, 63 S. W. 360, and of our own court in the case of Dey v. United Rys., 140 Mo. App. 461, 120 S. W. 134. The authorities bearing on the case are very fully set out and reviewed in the Dey Case. We do not consider it necessary to go over them at any length.

It is true that the cases referred to are of travelers in vehicles or foot passengers, or those on horseback, and some of them are street car cases. Plaintiff is not operating a street car line; it avers that it is a railroad. As defined by our law, Revised Statutes 1909, section 3214, it is a railroad. [Penney v. Stockyards Co., 212 Mo. 309, l. c. 323, 111 S. W. 79.] It performed the service peculiar to one in that it was engaged in carrying freight, although it does not appear to have been a common carrier to the extent of carrying freight for the general public. Its charter is not before us. But it partook, both in the manner of its operation, in its equipment and the place of its operation, of many of the features peculiar to a street railroad. Whether an ordinary railroad or a street railroad or even a private party traveling across the tracks of a railroad, we know of no reason why at least the same degree of care should not be exercised in the one case as the other. In the case at bar, the court, at the instance of defendant, gave an instruction based on section 3303, Revised Statutes 1909, which requires street cars to be brought to a full stop at least ten and not more than twenty feet before reaching the tracks of a railroad company. We agree with the learned counsel for respondent, that plaintiff not operating a street railway, was not subject to the provisions of this section. It would seem to come more properly

under the provisions of section 3099, which requires all trains to come to a full stop not less than ten nor more than sixty rods before reaching any railroad junction, etc. But under the view we take of this case, we do not in any way pass upon this point.

By the testimony of plaintiff's own witnesses, the motor car or dummy in charge of plaintiff's employees was approaching a place of known danger, a railroad crossing at which, to reach the switch, which was the objective point of plaintiff's car, it was necessary to cross two railroad sidetracks which were in constant use, as it appears, and as known to these employees— obviously a dangerous place. To the north of this crossing was the coal office referred to; to the north of that was a shed or a high board fence six feet high; either of these obstructions limiting the point of view to the north to such an extent that no prudent man in charge of an unwieldly moving vehicle, the best rate of speed of which was three miles an hour, should have attempted to cross these tracks without going out to a point far enough ahead to enable him to see to the north, or up and down the tracks, and so make sure that there was no impending danger from moving trains. According to the undisputed testimony of the two witnesses for plaintiff, the dummy was never brought to a stop at all until halted and demolished by collision with the train of the Wabash. The dummy was then going at its best speed, from two to three miles an hour. It was never stopped to give time to Haines, or for that matter the motorman, to have looked and to have ascertained whether any danger was approaching. According to this testimony the very best that could be done with the dummy going at the rate of from two to three miles an hour was to stop it within its own length, about twenty-five or thirty feet. Under such a state of facts and with such a machine in their charge, it was in the highest de-

gree negligent and even reckless for the motorman to have ventured on a track situated as was that of the defendant Wabash Company at that place, without first stopping his motor and using all reasonable caution to see that it was safe to cross, so much so as to completely debar plaintiff, under the facts here in evidence from recovery.

The plaintiff denies the application of the Dey Case to that of railroads, holding that it is applicable alone to the movement of street cars and to travel on public streets. We cannot accede to this proposition. An examination of the opinion in the Dey Case shows that the judge who delivered it cites in its support not only cases involving street car management but of steam railroads. It is to be said of the case at bar as was said in the Dey case, that the last clear chance doctrine is not involved in this case. It is laid down in the Dey case, treating of negligence, that car tracks are presumptively dangerous and that every intelligent person who has arrived at years of discretion is presumed to know that it is dangerous to go upon a railroad track when the cars are passing to and fro. Quoting from that decision (l. c. 470-1): "In view of these known dangers, the law affixes the obligation upon a traveler to be vigilant and watchful for the approach of cars. To this end, the law enjoins that he shall look and listen before going upon the tracks and if his vision is obscured so that he may not see, the law enjoins more particularly that he shall vigilantly listen for danger." This is a duty irrespective of statutes or ordinances, which, for its violation, impose penalties. The right to recover for negligence is independent of them. All of the cases, with one or two exceptions, cited in support of the above proposition by the judge who wrote the opinion, are cases of steam railroads, not of street railroads, demonstrating that this rule of law is as applicable to the one as to the

other. It is further said in the same opinion, quoting from the decision of Washington, etc., Ry. Co. v. Lacey, 94 Va. 460, 1. c. 475, that "the mere fact of looking and listening is not always a performance of the duty incumbent upon the traveler, for he must also exercise care to make the act of looking and listening reasonably effective. He must not approach the track at such a rate of speed that when he reaches a point where he can see or hear the train it is too late to protect himself from injury. He must exercise ordinary care in attempting to cross, or in crossing the track, and care is never ordinary care unless it is proportionate to the known danger."

Referring to the obligation of all approaching a railroad crossing, which is so situated by reason of obstructions as to prevent a view up or down the track of the railroad, in Kelsay v. Railway, supra, our Supreme Court has said (1. c. 372) that it is "the duty of a traveler upon a highway, in approaching a railroad crossing, to use all reasonable precaution to ascertain the approach of trains, and to avoid injury by them is well-settled law not only in this court, but perhaps of all· the courts of this country. The law imperatively requires him to look carefully, in both directions, at a convenient distance from the crossing, before venturing upon it, if, by looking, a train could be seen. The duty will not be performed by attempting to look only from a point at which the view is obstructed. The duty is a continuing one until the crossing is reached. If there is a point between the obstruction and the track which gives opportunity to see, it is the duty of the traveler to look. He cannot close his eyes and thereby relieve himself of the consequence of his own neglect." In many of the facts so far as looking up and down the tracks which this dummy and its crew were about to cross, the facts in the case at bar are very similar to those in the Kelsay case, and in that

case the evidence was as strong for the plaintiff there as for the plaintiff here, as to the care to be taken before crossing. In point of fact more care, more caution, appears to have been taken in the Kelsay case than the crew of this dummy exercised in the case at bar. Our Supreme Court, however, reversed the judgment in the Kelsay case without remanding it. The majority opinion in Hook v. Railway, supra, is also along these same lines. There it was claimed that a hill obstructed the view. This the court holds did not absolve plaintiff from the duty of care in crossing. To repeat, in the case at bar the agents of plaintiff were operating an unwieldly machine, going at a very slow rate, at from two to three miles an hour, that its best possible rate. It could only be stopped inside of its own length, thirty feet. To go onto these tracks with such a machine and with the obstructions created by the presence of the coal office and of the high board fence, preventing sight along the path down which a known danger was apt to rush at any moment, without the most vigilant watch, was gross negligence; was the negligence which directly, not only contributed to, but caused the accident. Under these facts plaintiff cannot recover. The judgment of the circuit court is reversed. *Nortoni* and *Caulfield, JJ.*, concur.

