GUSSIE C. BRISCOE, Respondent, v. CHICAGO & ALTON RAILROAD COMPANY and J. L. CORDER, Appellants.

St. Louis Court of Appeals. Opinion Filed February 4, 1919.

1. **MASTER AND SERVANT:** Death of Servant: Cause: Evidence. Evidence reviewed and *held* sufficient to establish that a field

switchman was killed by reason of his being caught and crushed between two cars, etc., so that the court did not err in refusing peremptorily to direct a verdict for defendants, on the ground that the manner in which deceased was killed was left purely to conjecture and speculation.

2. ——: ——: Negligence of Member of Switching Crew.. In an action for the death of a field switchman, evidence *held* sufficient to establish negligence on the part of the servants of the defendant railroad company, constituting the other members of the switching crew.

3. TRIAL PRACTICE: Demurrer to the Evidence. On demurrer the evidence must be viewed in the light most favorable to the plaintiff.

4. MASTER AND SERVANT: Fellow Servants: Negligence of Fellow Servant: Liability of Master. Since the common-law fellow servant rule no longer prevails as to railroads, the negligence of the engine switchman alone, resulting in the death of the field switchman, is the negligence of the defendant railroad company.

5. ——: Injury to Servant: Contributory Negligence. Evidence *held* not to warrant the conclusion that the field switchman, killed by being crushed between two cars, was guilty of negligence, as a matter of law, barring the right of recovery.

6. ——: Evidence: Conclusions of Witnesses: Harmless Error. Where a witness had been fully questioned as to the custom and practice in vogue in a railroad yard where a field switchman was killed, and his subsequent examination showed that his answers were predicated upon such custom and practices, rulings permitting interrogation as to what signals should be given, and as to when the engine should move or not move under certain circumstances, while subject to criticism, cannot be regarded as prejudicial error.

7. ——: ——: Admission of Testimony: Harmless Error. In an action for the death of a field switchman, the court committed no prejudicial error in allowing the answer of a witness with reference to what he saw the next morning on the coupler of the car, to stand.

8. ——: Erroneous Instruction not Affecting Rights or Merits: Not Reversible Error. In giving an instruction erroneously defining negligence *held*, in view of the character of the case and the other instructions given, not to constitute error materially affecting the merits of the action within section 2082, Revised Statutes 1909, or error affecting the substantial rights of appellants within section 1850, Revised Statutes 1909.

9. TRIAL PRACTICE: Instructions: Sufficient Given: Refusal of Others Not Error. Where the instructions given fully covered

issues to be submitted to the jury, it was not prejudicial error to refuse to direct special attention to certain matters, telling the jury that there was no evidence·as to each of them.

Appeal from the Circuit Court of Audrain County.— Hon. *James D. Barnett*, Judge.

AFFIRMED.

*A. C. Whitson* and *Charles M. Miller* for appellants.

(1) The trial court erred in not sustaining defendants' peremptory instructions to find for the defendants for the reasons, (a) that the evidence disclosed no negligence on the part of either defendant, causing the death of Briscoe, (b) that deceased Briscoe's negligence was the proximate cause of his death, and (c) that the manner of his death was mere conjecture. Harris v. Railroad, 180 Mo. App. 583, 166 S. W. 335 and cases therein cited; Neal v. Railroad, 105 N. W. 197-199; Grant v. Railroad, 190 S. W. 586, and cases therein cited; Swearingen v. Railroad, 221 Mo. 644-656; Warner v. Railroad, 178 Mo. 125-134. (2) The trial court erred in giving plaintiff's instructions No. 1 and No. 4, and in refusing defendants' instructions Nos. 6 to 12, inclusive. Houck v. Railroad, 116 Mo. App. 559-567, 92 S. W. 738; Storage & Moving Co. v. Railroad, 120 Mo. App. 410-413, 97 S. W. 184; Kirkpatrick v. Railroad, 211 Mo. 68-83; Cohn v. Kansas City, 108 Mo. 392, 18 S. W. 973. (3) The trial court erred in admitting over the objection of defendants incompetent evidence, (a) of witness Pimpell, for the reason that it permitted him to set up his own standard of care, state his own conclusion as to what should have been done, deciding one of the ultimate issues, thus invading and usurping the province of the jury, (b) of witness McIntosh, in permitting him to testify as to a mere conclusion, surmise and conjecture, relating to whether or not he afterwards found blood on the knuckle of the coupler. Marshall v. Taylor, 168 Mo. App. 240, 153 S. W. 527-

530, and cases therein cited; Glascow v. Metropolitan, 191 Mo. 347, 89 S. W. 915-920; Labbat's Master and Servant (2 Ed.), section 1597, and cases cited thereunder.

*Clarence A. Barnes* and *Fauntleroy, Cullen & Hay,* for respondent.

(1) .The proof is ample to sustain the conclusion that deceased was killed while adjusting a knuckle as he was in the act of passing to the north track by the defendant starting its engine a second time to make a second effort to couple. Union Stock Yards Co. of Omaha v. Conoyer, 59 N. W. 950; C., B. & Q. Ry. Co. v. Gunderson, 51 N. E. 708; Schlereth v. Mo. Pac. Ry. Co., 115 Mo. 87. (2) Deceased not guilty of contributory negligence by adjusting the knuckle on the standing car or passing over the track and was in no danger by so doing had the defendant not started its engine a second time without notice and run it east when the ordinary. and usual movement was west. The case at bar presents facts similar to the facts in judgment in the Kettlehake case, 171 Mo. App. 583, the Weaver case, 170 Mo. App. 284, and the Panebeango. case, 227 Ill. 170, all of which cases are cited and approved in the Harris case (see pages 594 and 595, Harris case, 180 Mo. App.). (3) The act of defendant in starting the engine a second time without notice and running it in an opposite direction without notice and contrary. to the established custom and without keeping a lookout is evidence of negligence which creates an issue for the jury. Lewis v. Wabash R. R. Co., 142 Mo. 597; Hollenbeck v. Railroad, 141 Mo. 99; Rutledge v. Railroad, 123 Mo. 121, 134; 1 Labatt, Master & Servant, sec. 213a; Penny v. Stock Yards Co., 212 Mo. 309. The system of rules or methods adopted by the master for the conduct of his business forms a part of the contract of hiring and are binding on both master and servant. The violation thereof by the master to the injury of the servant is culpable negligence. I. C. Ry. Co.

v. Burton, 79 S. W. 823; Louisville Ry. Co. v. Heck, 17 A. & E. R. Cas. 389; 4 Thomp. Neg. (2 Ed.), sec. 4165; Penn. Co. v. Whitcomb, 111 Ind. 212, 12 N. E. 380; Wharton Neg., Secs. 205-233; Luebke v. C. M. & St. P. Ry. Co., 63 Wis. 91; Sobieski v. St. Paul Ry. Co., 41 Minn. 169; Railway Co. v. Murphy, 50 Ohio St. 135; Railway v. McElyea, 71 Tex. 389, 1 L. R. A. 411. When the master, as is the case at bar, adopts a system of notification of danger, the servant has a right to rely upon such notification, and the master is guilty of negligence if he omits the customary signal. Jordan v. Railroad Co., 202 Mo. 418; Speed v. Atlantic & P. R. Co., 71 Mo. 303; St. Louis & S. W. Ry. Co. v. Rhea (Texas App.), 84 S. W. 428; Barker v. Cinn. N. C. & S. P. R. Co., 21 S. W. 340; Lake Shore R. Co. v. Schultz, 19 Ohio C. C. 639; Ring v. Mo. Pac. Ry. Co., 112 Mo. 220; 1 Labatt, Master and Servant, page 452, sec. 209; Anderson v. Northern Mill Co., 42 Minn. 424, 44 N. W. 315; Anderson v. Ogden Union R. & Depot Co., 8 Utah 128, 30 Pac. 305; Cincinnati R. Co. v. Barker, 17 Ky. L. Rep. 424, 31 S. W. 482; Britton v. Northern Pac. Ry. Co., 47 Minn. 340, 50 N. W. 231; Evansville Ry. Co. v. Holcomb, 9 Ind. App. 211, 36 N. E. 39; Amato v. Northern Pac. Co., 46 Fed. 464; Smith v. Atlantic Air Line Co., 132 N. S. 824, 44 S. E. 663; Northern Pac. Ry. Co. v. Craft, 16 C. C. A. 834; 4 Thomp. Neg. (2nd Ed.), secs. 4067 and 4167; The customary method of the defendant in the particular respect in question is always competent to explain the acts of the parties and may be considered on the issue of defendant's negligence and plaintiff's freedom from contributory negligence. St. L. Nat'l Stk. Yds. v. Godfrey, 198 Ill. 288; Bachant v. R. R. Co., 187 Mass. 392; Encyclopedia of Ev., p. 474. The custom, usage or practice shown in this case was proved by the testimony of a person acquainted with the facts, and in every instance it was shown that the person testifying actually had adequate knowledge of the usage as a fact, and he was therefore qualified to testify and state what that usage was. Conner v. Citizens Railway Co., 146 Ind. 430; Shield v.

Belt Ry. Co., 87 Mo. App. 644; Lawson Usages and Customs 101; 29 A. & E. Ency. of Law, 401, etc.

ALLEN, J.—This is an action by the widow of Walter W. Briscoe, deceased, to recover damages for the death of said deceased, alleged to have resulted from the negligence of the defendants. The trial below, before the court and a jury, resulted in a verdict and judgment in favor of plaintiff, against both defendants, in the sum of $5000; and the case is here on defendants' appeal.

Briscoe was employed by defendant railroad company as a switchman, and was killed on June 18, 1914, while engaged in the line of his duty as an employee of that defendant in its yards at Francis, a short distance east of Mexico, Missouri. He was a member of a switching crew engaged at the time in switching certain cars from a so-called pocket track to what is termed the C. B. & Q. main track. The tracks at this place extend approximately east and west, the pocket track lying ten or twelve feet south of this main track, the west end thereof connecting with the main track at a certain switch. There were various other tracks thereabout with which we are not here concerned. On the morning of the day mentioned this switching crew went to work at about 3:15 A. M. The crew was composed of the engineer, the fireman, one Jordan who was yardmaster or switching foreman, defendant Corder who was the "engine switchman," and the deceased, Briscoe, who was the "field switchman."

Upon this pocket track had been placed, on the previous evening, the cars composing a local or "plug" train; and these cars were to be switched to the main track mentioned, in order to make up this local train with the cars in their proper order. The testimony is that when the crew went to work that morning Corder and Briscoe went to the pocket track and uncoupled the safety chains, air hose and whistle hose on the "passenger equipment" on this local train, according to their custom. It appears that certain other cars, with

which we are not concerned, were first switched from
this pocket track, and that the crew then began to
switch the cars composing the local train. As these
cars stood upon that track, before any of them were
switched, the first car to the west was what is termed
a "ladies coach;" the next was coach No. 56; the next
was a combination car, No. 775; and the last car was a
"C. B. & Q. box car." The ladies coach was switched
from the pocket track to the main track, i. e. it was
pulled west until it passed upon the main track and
beyond the switch, and then, after the switch had been
thrown, it was pushed east on the main track to a
position a short distance east of its original position on
the pocket track. As that car was taken from the
pocket track Briscoe "cut the coupling," i. e. un-
coupled it from car No. 56 immediately east of it, by
pulling a lever or rod which could be operated without
going between the cars. It appears that Briscoe then
crossed to the north side of the pocket track. It seems
that the ladies coach was not coupled to another car on
the main track, but simply placed in position, and it is
said that Briscoe had nothing further to do with that
car. Corder testified, however, that three other cars
were switched before the engine came back to get car
No. 56 on the pocket track, and that Briscoe assisted in
that work. In any event Briscoe's duties took him
to some point north of the pocket track, along the main
track; and as the engine was returning again to the
pocket track to get car No. 56, he worked across that
track, to the south side thereof, immediately west of
Car No. 56, and proceeded along the south side of the
car, to the east end thereof, where his duty required
him to be in order to uncouple the car from the car
east of it. As the engine proceeded east on the pocket
track, to take out car No. 56, Jordan and Corder rode
on the front thereof. The evidence shows that it was
then about four o'clock; that day was breaking, but
that there was not sufficient light to enable one to see
objects distinctly at any great distance. All of the
switchmen carried lanterns. As the engine thus pro-

ceeded east on this track, approaching car No. 56, both Jordan and Corder, as they testify, saw Briscoe pass from the north side of the pocket track across that track to the south side thereof, in front of the west end of car No. 56, and proceed east along the south side of that car. Jordan testified that he last saw Briscoe when the latter was at about the east end of that car. As the engine approached car No. 56, both Jordan and Corder, according to their testimony, signalled the engineer to proceed forward, while they were standing on the front of the engine. The testimony is that the three cars mentioned, standing on the pocket track, were then all coupled together. The engine proceeded forward until it struck the west end of car No. 56, in an effort to effect a coupling with that car. Upon this attempt, however, "they failed to make the coupling," as, it is said, happens "once in a while." The evidence is not entirely clear as to what was the movement of the cars east by reason of this impact. The engineer testified that car No. 56 moved about two feet. Thereupon, it is said, Jordan and Corder busied themselves in adjusting the knuckle at the west end of car No. 56, and when this knuckle was in readiness they signalled the engineer to again proceed forward, without looking to see where Briscoe was. Thereupon the engineer proceeded forward, striking car No. 56 again and effecting a coupling. During this time neither Jordan nor Corder had seen Briscoe or paid any attention to where he was or what he was doing. After making the coupling they perceived that car No. 56, to which the engine was then coupled, was uncoupled from the car east of it and separated therefrom by a distance of perhaps four or five feet. They thereupon signalled the engineer to move west with car No. 56, and it was switched upon the main track. While the engine and car were proceeding east on the main track, it was discovered that Briscoe was missing, and upon investigation his body was found lying on the north side of the pocket track, at or near the end of car No. 775 which remained on that track. His feet, it is said were

lying near the north rail of the pocket track, his body extending toward the northeast. It was found that his body had been crushed "through the chest," all of the ribs being broken, "both in front and behind, from the second rib down;" and that one arm had been broken. It appears that death was instantaneous.

There is testimony that the "buffers," about the platforms of these passenger coaches, which were close together when the cars were coupled, and would come in contact with each other when one car was run against another, were situated at such elevation above the level of the track as to strike a man, standing or passing between them, of average height, as was Briscoe, at about the chest and ribs. And the testimony further shows that it was Briscoe's duty, after uncoupling car No. 56 from the car east of it, to go from that point of the west end of the "ladies coach," as it then stood on the main track, in order to adjust the knuckle at the west end of that car, if need be, and to see that a coupling was effected when car No. 56 reached the ladies coach.

Further matters appearing in the testimony will be referred to in the course of the opinion.

I.

It is earnestly insisted by learned counsel for defendants, appellants here, that the trial court erred in refusing to peremptorily direct a verdict for defendants. It is argued that, under the evidence adduced, the manner in which Briscoe came to his death is left purely to conjecture and speculation; and that the demurrer should have been sustained on this ground. A consideration of the evidence, however, has led us to the conclusion that the testimony and physical facts shown in the case sufficed to establish, with sufficient certainty, the manner in which Briscoe was killed. When last seen alive he was at or near the east end of car No. 56, on the south side of the pocket track, where his duty required him to be in order to "cut the coupling." His body was found on the

opposite side of that track, almost, if not directly, opposite the point where he was last seen. He was not run over by a car; on the contrary, the position of his body, the nature of the injuries, and the testimony as to the height of the buffers upon these cars, show that he was crushed between these two cars, while in an upright position between them, after he had in some manner moved from the south side of the cars to a point near the northern rail of this track. Such is the irresistible inference from the testimony and the physical facts shown in evidence. Furthermore, there is positive testimony that when the engine first approached car No. 56 all of these cars were coupled together; and when coupled together one could not pass between the buffers. Briscoe, last seen on the south side of car No. 56, at about the east end of that car, could not have gone between the cars until after the first impact of the engine and the uncoupling of the cars at or about that time. And when this physical fact is reckoned with, it is to be legitimately inferred, we think, from all of the facts in evidence, that Briscoe met his death by reason of being caught and crushed between these two cars, in the manner indicated above, when the engine struck car No. 56 the second time. The testimony and the physical facts in evidence suffice, in our judgment, to warrant the jury in drawing such inference as to the manner of his death. [Buesching v. Laclede Gas Light Co., 73 Mo. 219, l. c. 230.] This conclusion, we think, is not reached by piling one inference upon another, but by inference or inferences drawn directly from and resting upon proven facts; nor does it rest upon mere speculation and conjecture. [See Lynch v. Railroad, 208 Mo. 1, and cases cited, 106 S. W. 68.] The facts involved in Swearingen v. Railroad, 221 Mo. 644, 120 S. W. 773; Warner v. Railroad, 178 Mo. 125, 77 S. W. 67, and Grant v. Railroad, 190 S. W. 586, cited by appellants, are in each instance so far unlike the facts here involved as to make the decisions therein inapplicable.

## II.

It is argued, however, that in no event do the facts shown in evidence establish any negligence on the part of the servants of the defendant railroad company constituting the other members of this switching crew. In this connection it becomes necessary to refer to some portions of the evidence in more detail.

Robertson, the engineer, called as plaintiff's witness, testified, on cross-examination, that if it became necessary for a switchman to go under a car or between cars it was the custom, and the duty of the switchman, to give a signal to the engineer indicating this. On re-direct examination he was asked what the rules of defendant railroad company required of the engine switchman and the yardman, or switching foreman, "with reference to obtaining or not obtaining a signal from the field switchman before coupling into a train about which the field switchman is employed." The witness at first stated that he did not know what the custom was. Later, after certain objections were made and overruled, he was again asked, "What is that custom?" And he answered: "Well, they always know where all the men are before they move the train, that is if they know they are down in there working on them."

Jordan, the yardmaster, also called as a witness for plaintiff, testified that he received no signal from Briscoe when he signalled the engineer to come forward, either at the time of the first attempt to effect a coupling with car No. 56, or upon the second occasion when the coupling was made; that the whistle and bell are not used when the engine is engaged in switching; and that he and Corder were not expecting any signal from Briscoe. He also testified that when a switchman goes between cars it is his duty to give a stop signal; that this was the custom and rule of the company. This witness further testified that he had been employed by the defendant at these yards for about three years; and that the same system, practice and rules in force

at the time of Briscoe's death had been in force during all of that period.

One Pimpell, called as a witness for plaintiff, had previously worked for a number of years in these yards, his last position being that of yard foreman. He last worked there about a year and nine months prior to Briscoe's death, but his testimony as to the customs and practices in this yard was admitted upon the ground that Jordan's testimony, supra, showed that the same customs, practices and rules had been in effect for approximately three years prior to June 18, 1914; and this ruling is not questioned here. An assignment of error before us, however, relates to the rulings below on objections interposed by defendants to certain questions asked this witness; which matter we shall later dispose of.

Pimpell, among other things, testified, in effect, that, under the custom and practice in this yard while he was there, if an attempt to make a coupling failed, then before making a second attempt it was the duty of the engine switchman not to signal the engineer to move the engine forward in the absence of a signal from the field switchman or until he knew that the field switchman was in a safe place. And later, in answer to a question as to what was the custom and practice of the engine switchman in respect to keeping a lookout for the field switchman during switching operations, he said: "The custom and practice was to know where his field man was before coupling in a string of cars at all times."

Defendant Corder, the only witness for defendants, testified to the effect that, under the customs and practices, no signal was needed from Briscoe before effecting a coupling of the engine to car No. 56; and that if a switchman goes between cars or under a car he should give a stop signal.

Viewing the evidence in the light most favorable to plaintiff, as it must be viewed for the purposes of the demurrer, we think that it suffices, prima facie, to establish negligence on the part of the servants of de-

fendant railroad company. If indeed it was the established custom and practice, and the consequent duty, of the engine switchman, or of the yardmaster, to see that the field switchman was not in a place of danger, under circumstances of this character, before signalling the engineer to move forward, it appears that this duty was violated. As said, both Corder and Jordan saw Briscoe proceeding along the south side of this car for the purpose of cutting the coupling. The former says that he last saw Briscoe when the latter had traversed about one-half the length of the car; while the latter says that he last saw Briscoe at or near the east end of the car, the engine being then about a car length from the west end thereof. Neither looked further to ascertain Briscoe's position, or paid any further attention to him until after the coupling of the engine to car No. 56 had been effected and until that car had been switched to the main track. In this view, negligence appears on the part of both defendants; for since the common law fellow-servant rule no longer prevails as to railroads, the negligence of Corder alone is the negligence of the defendant railroad company.

In view of the testimony here adduced the decision of this court in Harris v. Railroad, 180 Mo. App. 583, 166 S. W. 335, upon which appellants place great reliance, is, we think, without application.

### III.

Nor, under the circumstances, do we think that the evidence warrants the conclusion that Briscoe was guilty of negligence, as a matter of law, barring plaintiff's right of recovery herein. Whether it may be inferred that Briscoe went between these cars, after the first attempt to couple the engine to car No. 56, for the purpose of walking to the ladies coach on the main track, where his duties required him to go, we do not say. One witness testified that on "the next morning" he examined the couplers and buffers on car No. 56 and car No. 775, and found on one coupler on car No.

something that "looked like a splotch of blood;" though on cross-examination he said that he was not certain whether it was blood or rust. Upon this, with the other circumstances shown, respondent predicates an argument to the effect that it may be inferred that Briscoe was adjusting this knuckle when killed; but we need not reckon with this theory. No witness saw what Briscoe did at that time; and the presumption is to be indulged that · he was in the exercise of ordinary care for his own safety, unless this presumption can be said to have been overcome by the facts and circumstances in evidence. But apart from this, if, in performing his work, he went between the cars in reliance upon the duty which, according to a custom prevailing, devolved upon the engine switchman and yardmaster not to signal the engineer to proceed until he .was seen in a place of safety, or signalled, .then there was not such contributory negligence on his part as to bar plaintiff's recovery. [See Penney v. Stock Yards Co., 212 Mo. 309, 111 S. W. 79.]

We are of the opinion that the demurrer to the evidence was properly overruled. .

## IV.

The assignment of error which challenges the ruling of the trial court in admitting certain testimony of the witness Pimpell, over defendants' objections, proceeds upon the theory that certain questions asked this witness permitted him to state his own conclusions, as to what should or should not have been done, and to pass upon one of the ultimate questions of fact in issue, invading the province of the jury.

The first of the questions asked this witness, to which appellants direct attention, is the following: "Supposing the engineer drives in and attempts to make the coupling and fails, what signals, if any, should be given by or received from the field switchman?" After objection made and overruled, but be-

fore the witness had answered, plaintiff's counsel asked the question in this form: "What signals, if any, were in vogue and should be given before a second coupling was attempted?" In this form the question is not open to serious objection, since it seeks to elicit the custom or practice in such matters. Later, however, plaintiff's counsel, over defendants' objections, was permitted to interrogate this witness as to "what signals should be given," and as to whether the engine "should" move or not move, under certain circumstances. And the witness answered by stating what "should" or "should not" have been done under the circumstances.

While in form these questions are technically subject to criticism, under the circumstances the rulings below upon defendants' objections' cannot be regarded as prejudicial error. In the first place, this witness had been thertofore fully questioned as to his knowledge of the customs and practices in vogue in this yard when he worked there; and his subsequent examination as a whole shows that his answers to all of those questions were predicated upon these customs and practices. And following the questions mentioned above, plaintiff's counsel asked this witness what the "custom and practice" was as to keeping a lookout for the field switchman; and the witness answered: "The custom and practice was to know where his field man was before coupling in a string of cars at all times."

In eliciting testimony, as to the customs and practices in vogue, counsel frequently did not take the trouble to put their questions in the best form. Indeed, questions of defendants' counsel often required the witness to state what was the "duty" of a member of this crew, what signal "should" have been given, etc. Counsel evidently proceeded upon the theory that it was fully understood that such questions related to the conduct of the members of this crew as affected by the customs and practices prevailing; and obviously such was the case.

Complaint is also made of the admission of testimony of the witness McIntosh in regard to what he saw the next morning on the coupler of car No. 775. In answer to a question, the witness said: "Well I am not sure, but it looked like a splotch of blood." Defendants' counsel objected to the witness testifying in regard to the matter if he was "not sure about the thing," which objection was overruled, defendants excepting. It is urged that the witness was thereby permitted to surmise and conjecture. Strictly speaking, if this testimony was improper a motion should have been made to strike it out. But in any event we think that the court committed no prejudicial error in allowing the answer to stand. The witness did not undertake to affirm that the discoloration which he saw upon the knuckle was blood, but he did say, in effect, that it had the appearance of blood. We see no good reason why the answer should not have been allowed to' stand; and obviously the matter was one which could not have prejudiced defendant. It is true that on cross-examination the witness said that he was not certain whether it was blood or rust upon the knuckle; but the fact that he was not certain as to its nature did not prevent his testifying as to the appearance of what he saw.

## V.

Complaint is made, in a general way, of the first instruction given for plaintiff. We have carefully examined it and we perceive no prejudicial error therein.

Error is also assigned to the giving of plaintiff's instruction No. 4 attempting to define negligence, as follows:

"Negligence, as used in these instructions, is the omission to do something which a reasonable man, guided by those considerations which ordinarily regulate the conduct of human affairs would do or the doing of something which a prudent and reasonable

man would not do under the circumstances of a given case."

This instruction fails to follow the well known definition of the term negligence, and we are at a loss to understand why it was given in this form. Nevertheless, we think that we could not with propriety hold that the giving thereof constituted reversible error, under the circumstances. Plaintiff's main instruction required the jury to find such facts as in themselves would constitute negligence on the part of both defendants, in the view of the case which we have taken above. A technical error in defining negligence could not have affected the jury's findings under this first instruction. The term negligence is used in but one other place in plaintiff's instructions, viz., in an instruction on contributory negligence, which told the jury, in effect, that to find the deceased guilty of contributory negligence they must find that he failed to exercise ordinary care for his own safety.

In defendants' first instruction appears the expression "negligence as charged in the petition;" but the effect of this instruction is merely to tell the jury that there is no evidence, as to a defective coupling, and that "this is not an issue in the case." Another of defendants' instructions told the jury that there could be no recovery if Briscoe "was negligent in the least degree," and such negligence contributed to cause his death.

In view of the nature of the case, and the character of the other instructions given, we do not think that the giving of plaintiff's instruction No. 4 constituted error materially affecting the merits of the action (Sec. 2082, Rev. Stat. 1909) or error affecting the substantial rights of the appellants (Sec. 1850, Rev. Stat. 1909).

Complaint is made of the refusal of certain instructions offered by defendant, seven in number. That five of these, viz., Nos. 7, 8, 9, 11 and 12, were properly refused, follows from what we have said above in discussing the ruling below on the demurrer

to the evidence. By defendants' refused instruction No. 6 it was sought to have the jury told that there was no evidence that Briscoe "was attempting to uncouple the cars while between them, or that there was anything wrong with the coupling apparatus between car number 56 and 775 which required him to go between the cars for the purpose of making a disconnection or cut off." And by defendants' refused instruction No. 10 it was sought to have the jury told that there was no evidence that it was the practice and custom to sound the whistle or ring the bell on the engine during such switching operations, and that they could not find the defendant railroad company negligent in failing to sound the whistle or ring the bell before moving the engine against car No. 56. We think that it was not prejudicial error to refuse to direct special attention to these matters, telling the jury that there was no evidence as to each of them. The instructions given fully covered the issues in the case to be submitted to the jury; and we think that appellants have no just cause to complain of the refusal of these instructions.

We perceive no reversible error in the record, and it follows that the judgment should be affirmed. It is so ordered.

*Reynolds, P. J.,* and *Becker, J.,* concur.